**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| AMLIN CORPORATE MEMBER, LTD, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-09-2695 |
| | § | |
| | § | |
| LOGISTICS GROUP INTERNATIONAL, | § | |
| INC., *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

This is a dispute over insurance proceeds.  The insurer, Amlin Corporate Member, Ltd. filed this interpleader action against Logistics Group International, Inc. and Murabeni Plant Contractor, Inc. ("MPCI"), and deposited the proceeds with the court.  (Docket Entry Nos. 10, 16).[1]  This court discharged Amlin and awarded it attorneys' fees.  (Docket Entry No. 56).  MPCI cross-claimed against Logistics Group, and MPCI and Logistics Group filed cross-motions for summary judgment. MPCI moved for summary judgment that it is entitled to the insurance proceeds and seeking attorneys' fees and consequential damages.  (Docket Entry No. 53).[2]  Logistics Group filed two motions for summary judgment that it is entitled to the insurance proceeds.  (Docket Entry Nos. 59, 60).[3]

---

[1]  The original interpleader complaint named Murabeni America Corporation as a defendant.  (Docket Entry No. 1).  The amended complaint does not.  Murabeni America is not a party to any other claim.

[2]  Logistics Group responded, (Docket Entry No. 54), MPCI replied, (Docket Entry No. 58), and Logistics Group surreplied, (Docket Entry No. 65).

[3]  MPCI responded, (Docket Entry Nos. 63, 64), and Logistics Group replied, (Docket Entry Nos. 69, 70).  Logistics Group supplemented its filings to provide tables of contents and authorities.  (Docket Entry Nos. 71–73).

Based on the record; the motions, responses, replies, and surreply; and the relevant law, this court grants MPCI's motion for summary judgment that it is entitled to the insurance proceeds and denies Logistics Group's cross-motions seeking summary judgment that it is entitled to them. MPCI's motion for summary judgment that it is entitled to recover attorneys' fees is granted; MPCI's motion that it is entitled to consequential damages is denied. Final judgment is entered by separate order.

The reasons for these rulings are explained below.

## I.    Background

This case arises from the purchase by Ryobi Die Casting (USA), Inc., of an Okuna Machine Tool — Machining Center, Millac Model – 852 V, Serial No. 85555 (the "Machine") in early 2008. Ryobi sought to ship the Machine from the place of purchase, Buffalo Grove, Illinois, to a Ryobi affiliate, RDCM, in Irapuato, Mexico.  (Docket Entry No. 53, Ex. 1, ¶¶ 4–5).  The parties to this suit are: (1) MPCI, the company Ryobi hired to coordinate the shipping and installation of the Machine, including obtaining insurance and pursuing an insurance claim if needed, on Ryobi's behalf; and (2) Logistics Group, the company hired by Dunlap Trucking, the trucking company MPCI engaged to ship the Machine to its destination and to obtain insurance for the shipment.[4]

---

[4]    The summary judgment record consists of: the declaration of Mark C. Gunner, the general manager of RDCM, S. de R.L. de C.V., (Docket Entry No. 53, Ex. 1); the declaration of Craig Reed, the Indianapolis branch manager at MPCI, (*id.*, Ex. 2); Amlin's settlement with MPCI and Ryobi, (*id.*, Ex. 3); Ryobi's contract with MPCI, (*id.*, Ex. 4); a bill of lading issued by MPCI, (*id.*, Ex. 5); the declaration of Myron L. Dunlap, president of Dunlap Trucking, (*id.*, Ex. 6); the contract between MPCI and Dunlap Trucking, (*id.*, Ex. 7); the MPCI–Dunlap Trucking order form, (*id.*, Ex. 8); the Dunlap Trucking–MPCI invoice, (*id.*, Ex. 9); a printout of Logistics Group's home page, (*id.*, Ex. 10); the contract between Dunlap Trucking and Logistics Group, (*id.*, Ex. 11); the Mexico Cargo Insurance Worksheet, (*id.*, Ex. 12); the Customer Order Control Sheet issued by Logistics Group, (*id.*, Ex. 13; Docket Entry No. 59, Exs. 3.D, 4.D; Docket Entry No. 60, Exs. 3.D, 4.D); Logistics Group invoice number 15020, (Docket Entry No. 53, Ex. 14); Logistics Group's insurance policy, (*id.*, Ex. 15; Docket Entry No. 59, Exs. 2, 3.I; Docket Entry No. 60, Ex. 2, 3.I); Certificate of Insurance No. CBA 2205/100369, (Docket Entry No. 53, Ex. 16; Docket Entry No. 59, Exs. 1, 3.F, 4.F; Docket Entry No. 60, Ex. 1, 3.F, 4.F); an e-mail chain ending with Donna Hussey's November 29, 2008 e-mail to Reed Craig, (Docket Entry No. 53, Ex. 17); an e-mail chain ending with Bryan Winkles's December 2, 2008 e-mail to Myron Dunlap, (*id.*, Ex. 18); a

In its response to MPCI's motion for summary judgment, Logistics Group objects to 55 of

MPCI's 58 exhibits "on the grounds of hearsay and absence of authentication." (Docket Entry No.

54 at 19). Logistics Group asserts that the exhibits are "replete with speculation and with legal

conclusions and opinions of non experts, and are not supported by expert opinions or credible

printout of Logistics Group's web page on insurance, (*id.*, Ex. 19); excerpts from Bryan Winkles's deposition, (*id.*, Ex. 20; Docket Entry No. 58, Ex. 1); Vincent Lynne's January 21, 2009 e-mail to Myron Dunlap, (Docket Entry No. 53, Ex. 21); MPCI's July 14, 2008 notice of claim to Dunlap Trucking, (*id.*, Ex. 22); Craig Reed's August 20, 2008 letter to Myron Dunlap, (*id.*, Ex. 23); the May 3, 2010 declaration of Raj Duvvuri, MPCI's attorney, (*id.*, Ex. 24); MPCI's April 23, 2009 check to Logistics Group for $29,417.68, (*id.*, Ex. 25); Bryan Winkles's July 29, 2008 e-mail to Myron Dunlap, (*id.*, Ex. 26); Donna Hussey's August 13, 2008 e-mail to Bryan Winkles confirming the claim on Logistics Group's policy, (*id.*, Ex. 27); Stephen Day's January 26, 2009 e-mail to Vincent Lynes, (*id.*, Ex. 28); Craig Reed's June 24, 2009 e-mail to Amlin's Luke Baker, (*id.*, Ex. 29); Logistics Group's June 3, 2009 check to MPCI for $12,649.42, (*id.*, Ex. 30); an e-mail chain ending with Craig Reed's September 23, 2008 e-mail to Bryan Winkles and Donna Hussey, (*id.*, Ex. 31); an e-mail chain ending with Stephen Day's October 29, 2008 e-mail to Donna Hussey and Bryan Winkles, (*id.*, Ex. 32); Bryan Winkles's August 26, 2008 e-mail to Donna Hussey, (*id.*, Ex. 33); an e-mail chain ending with Myron Dunlap's June 26, 2009 e-mail to Craig Reed, (*id.*, Ex. 34); an e-mail chain ending with Myron Dunlap's e-mail to MPCI's Tomiko Wickersham and Jennifer Grant, (*id.*, Ex. 35); Bryan Winkles's August 21, 2008 e-mail to Myron Dunlap, (*id.*, Ex. 36); an e-mail chain ending with Stephen Day's April 16, 2009 e-mail to Donna Hussey, (*id.*, Ex. 38); Myron Dunlap's August 15, 2008 e-mail to Tomiko Wickersham, (*id.*, Ex. 39); Myron Dunlap's November 6, 2008 e-mail to Bryan Winkles, (*id.*, Ex. 40); Vincent Lynes's June 4, 2009 e-mail to Stephen Day, Craig Reed, and Tomiko Wickersham, (*id.*, Ex. 41); Vincent Lynes's May 6, 2009 e-mail to Donna Hussey and Stephen Day, (*id.*, Ex. 42); Richar Murray's May 18, 2009 e-mail to Donna Hussey, (*id.*, Ex. 43); Stephen Day's May 13, 2009 e-mail to Vincent Lynes and Donna Hussey, (*id.*, Ex. 44); Donna Hussey's May 6, 2009 e-mail to Craig Reed, (*id.*, Ex. 45); Stephen Day's May 7, 2009 e-mail to Myron Dunlap, (*id.*, Ex. 46); Stephen Day's May 7, 2009 e-mail to Myron Dunlap, (*id.*, Ex. 47); a Logistics Group spreadsheet showing a $90,182.92 balance owed by Dunlap Trucking, (*id.*, Ex. 47); an e-mail chain including Stephen Day's April 13, 2009 e-mail to Donna Hussey and Eloy Vazquez, (*id.*, Ex. 48); Craig Reed's April 20, 2009 letter to Stephen Day, (*id.*, Ex. 49); Myron Dunlap's April 10, 2009 letter to Craig Reed, (*id.*, Ex. 50); Stephen Day's April 20, 2009 e-mail to Craig Reed, (*id.*, Ex. 51); Ryobi's claims assignment to MPCI, (*id.*, Ex. 52); Dunlap Trucking's claims assignment to MPCI, (*id.*, Ex. 53); a spreadsheet summarizing Ryobi's outsourcing costs, (*id.*, Ex. 54); invoices relating to Ryobi's outsourcing costs, (*id.*, Ex. 55); United States Postal Service shipping confirmation confirming delivery of MPCI's check to Logistics Group, (*id.*, Ex. 56); an e-mail chain ending with Stephen Day's October 29, 2008 e-mail to Donna Hussey and Bryan Winkles, (*id.*, Ex. 57); an e-mail chain ending with Stephen Day's October 29, 2008 e-mail to Donna Hussey, (*id.*, Ex. 58); the affidavit of Stephen Day, the president of Logistics Group, (Docket Entry No. 59, Ex. 3; Docket Entry No. 60, Ex. 3); the Transportation Co-Brokerage Agreement between Logistics Group and Dunlap Trucking, (Docket Entry No. 59, Exs. 3.A, 4.A; Docket Entry No. 60, Exs. 3.A, 4.A); the 30 Day Credit Terms & Conditions agreement between Logistics Group and Dunlap Trucking, (Docket Entry No. 59, Exs. 3.B, 4.B; Docket Entry No. 60, Exs. 3.B, 4.B); Logistics Group's broker license from the United States Department of Transportation, (Docket Entry No. 59, Exs. 3.C, 4.C; Docket Entry No. 60, Exs. 3.C, 4.C); Logistics Group's Carrier Confirmation, (Docket Entry No. 59, Exs. 3.E, 4.E; Docket Entry No. 60, Exs. 3.E, 4.E); Certificate of Insurance No. CBA 20225/100355, (Docket Entry No. 59, Ex. 3.G; Docket Entry No. 60, Ex. 3.G); a statement showing a $12,649.42 wire transfer from Ropner Insurance to Logistics Group, (*id.*, Ex. 3.H); Bryan Winkles's affidavit, (Docket Entry No. 59, Ex. 4; Docket Entry No. 60, Ex. 4); excerpts from Craig Reed's deposition, (Docket Entry No. 59, Ex. 5; Docket Entry No. 60, Ex. 5); the affidavit of Logistics Group's attorney, Donovan B. Hutchins, (Docket Entry No. 59-6); Myron Dunlap's September 15, 2008 e-mail to Donna Hussey, (Docket Entry No. 58, Ex. 2); Myron Dunlap's November 14, 2008 e-mail to Bryan Winkles, Brandon Buehring, and Stephanie Day, (*id.*, Ex. 3); the May 28, 2010 declaration of Raj Duvvuri, (*id.*, Ex. 4); and Logistics Group's summary chart on the parties' relationship to the insurance policy, (Docket Entry No. 69, Ex. 1).

evidence" and characterizes them as "irrelevant to the issue of the right to payment of the insurance proceeds or any breach of contract by any person or party against Logistics." (*Id.* at 19–20).  Such conclusory objections are insufficient.  *See, e.g.*, *Tucker v. SAS Institute, Inc.*, 462 F. Supp. 2d 715, 722 (N.D. Tex. 2006).  MPCI provided arguments supporting each exhibit in response,  (Docket Entry No. 58, Ex. 5), and Logistics Group has not contested any of the arguments.

Logistics Group specifically objects to the declarations, the assignments, and to the deposition of its own corporate representative, Bryan Winkles.  The declarations, which are each signed, include the necessary indicia of authenticity, *see, e.g.*, *Philip Morris USA Inc. v. Lee*, 243 F.R.D.261, 263 (W.D. Tex. 2007), and the objections to their contents are too conclusory.  The assignments are authenticated by several declarations, and contracts are not hearsay, *see, e.g.*, *Everest Indem. Ins. Co. v. Allied Int'l Emergency LLC*, Civ. No. 4:08-CV-678-Y, 2009 WL 2030421, at *2 (N.D. Tex. July 14, 2009) ("A contract is not hearsay and, consequently, need only be authenticated in order to be admissible.").  The objections to the deposition are based on corrections to the deposition, and as MPCI points out, (Docket Entry No. 58 n.14), none of the changes affects the outcome.  The objections are overruled.

The record shows that on May 5, 2008, Ryobi engaged MPCI to coordinate shipping and installing the Machine, including obtaining insurance and pursuing the insurance claim on Ryobi's behalf.  (*Id.*, Ex. 4, Ex. 1, ¶ 7; Ex. 2 ¶ 5).  MPCI generated a bill of lading that listed the Machine and identified its value as $279,000.  (*Id.*, Ex. 5).  MPCI in turn entered into a contract on May 30[5] with Dunlap Trucking, an Arizona-based transportation company, to ship the Machine to RDCM's

---

[5]  The contract reads "March 30," but based on the timing of the other contracts and the Machine's shipment, that appears to be a typographical error.

Irapuato, Mexico plant.  (*Id.*, Ex. 2, ¶ 7; Ex. 6 ¶¶ 2–4; Ex. 7).  MPCI's contract with Dunlap

Trucking required it to "[t]ransport . . . equipment . . . to [the] RDCM plant in Irapuato, Mexico."

(*Id.*, Ex. 7).  In addition, MPCI's contract required Dunlap Trucking to obtain insurance for the

Machine during the shipment.  (*Id.*, Ex. 2, ¶7; Ex. 6, ¶4).

Dunlap Trucking entered into a contract with Logistics Group on May 29, 2008 to ship the

Machine from Laredo, Texas to Irapuato, Mexico. (*Id.*, Ex. 11).  Logistics Group "offers specialized

hauling and cargo transport between the United States, Mexico, and Canada."  (*Id.*, Ex. 10).

According to its website, "Logistics . . . recommends that its customers purchase Shipper's Interest

Cargo Insurance. . . . For your convenience, we offer you the option of purchasing this important

coverage as a part of our package of services." (*Id.*, Ex. 19).  The Logistics Group website describes

the insurance it will purchase for its customers: "'All Risk' Shipper's Interest Coverage provides

the owner of the cargo with coverage for direct physical loss or damage to the cargo without the

need to prove liability. . . . Unlike Motor Truck Cargo/Carrier's Liability Insurance, Shipper's

Interest insurance provides coverage for the direct physical loss or damage to the cargo, not the

Carrier's Liability." (*Id.*, Ex. 19).

Logistics Group issued an invoice to Dunlap Trucking dated July 28, 2009.  (*Id.*, Ex. 14).

$4,050.00 as the cost to ship the Machine and $2,340.11 to obtain "MEXICAN INSURANCE" to

cover the Machine in shipment, for a total cost to Dunlap Trucking of $6,390.11.  (*Id.*).  Logistics

Group also prepared a "Mexico Cargo Insurance Worksheet," which identified the insured property

as the Machine.  (*Id.*, Ex. 12).  The worksheet identifies the Machine's value as $279,000 and the

amount of insurance as $312,015.  (*Id.*).  The cost of the insurance is listed on the worksheet as

$2,340.11.  The worksheet lists the customer as "Ryobi Die Casting USA"; the person placing the

5

order as "Myron Dunlap," the president of Dunlap Trucking, the transportation company; and the

Logistics Group salesperson as "Bryan Winkles." (*Id.*).

Logistics Group held a cargo insurance policy issued by Amlin, Policy No. 07G400. (*Id.*,

Ex. 15). The Policy defines the "insureds" as "Logistics . . . and/or for whom they have instructions

to insure." (*Id.*). The Policy limited is $500,000 per occurrence and includes a $2,500 deductible

for losses in Mexico. (*Id.*). Certificate of Insurance No. CBA 20225/100369 shows that Logistics

Group scheduled the Machine under the Policy. The certificate states an insured value of

$312,015.00.

The shipment of the Machine began on June 6, 2008. It arrived in Irapuato on June 11. The

Machine was destroyed somewhere between Laredo, Texas, and Irapuato, Mexico. MPCI filed a

claim with Dunlap Trucking on July 14 and followed with a letter on August 20. (*Id.*, Ex. 1, ¶7; Ex.

2, ¶7; Exs. 22, 23). The letter stated:

> Please be advised that [MPCI] expects to be fully compensated for
> any and all damages occurring to materials and equipment contracted
> by MPCI to Dunlap . . . for transport to Ryobi Die Casting Materials
> . . . . Irapuato, Mexico. Our agreement with Dunlap provided for
> Dunlap to provide appropriate insurance coverage to protect against
> any possible damages incurred between the time the equipment was
> loaded on to the trucks and the time that it delivered to the RDCM
> factory.

(*Id.*, Ex. 23).

Logistics Group initially told Dunlap Trucking that it needed to file the claim for the

destroyed Machine with the insurer. In a July 29 e-mail, Winkles, the Logistics Group salesperson,

told Myron Dunlap that "[w]e will provide supporting documents upon [the insurer's request] but

claim has to [be] done by you." (*Id.*, Ex. 26). Winkles pledged that "we will help as much as we

can." (*Id.*). Eventually, Logistics Group filed the claim. Donna Hussey, an employee of Logistics

Group's insurance broker, Avalon Risk Management, Inc., confirmed the claim to Winkles and asked for supporting documentation.  (*Id.*, Ex. 27).  The confirmation lists "Marubini" as the claimant.  (*Id.*).

After initially questioning whether the Machine was covered under the Policy, Amlin concluded that the entire claim would be covered.  A dispute then developed between Logistics Group and MPCI.  Some time in early 2009, Dunlap Trucking ran into financial trouble.  The company owed $90,182 to Logistics Group under various contracts, most unrelated to the Machine shipment.  By April 2009, Logistics Group appears to have determined that it could cover the entire amount Dunlap Trucking owed it for different contracts from the insurance proceeds Amlin would pay for the destroyed Machine.  (*See id.*, Ex. 38 (e-mail from Logistics Group employee to Hussey noting, "I did notice on the policy's [*sic*] in question that it does in fact say all settlements are to be paid to LGI.")).  Logistics Group began to argue that it, not MPCI (which was asserting the claim on Ryobi's behalf), was entitled to the insurance proceeds.

On May 6, 2009, Vincent Lynes of Roper Insurance, Amlin's representative, sent the following e-mail to employees of Avalon Risk and Logistics Group:

> Having reviewed the documentation recently forwarded to Underwriters.  It would appear that LGI are expecting settlement funds to be made direct to them.  In writing LGI have confirmed their intention to deduct the freight due to them from the settlement amount before forwarding the balance to Marubeni.
>
> As in previous matters, settlement funds should be sent to direct to Marubeni unless they instruct otherwise.  We would expect that this claim would be settled and paid in the same way.  We remind you that Marubeni are the cargo owners and have the insurable interest in the damaged machinery.
>
> If Marubeni want any amounts paid direct to LGI they should confirm in writing that they are in agreement to funds being paid

> direct to LGI and that they authorize LGI to control all aspects of any
> subsequent distribution of those funds including, but not limited to,
> the amount of any subsequent distribution, date of payment, and the
> payee.  Underwriters will not participate in any commercial dispute
> and nor do they want settlement funds to be used to pay off what is
> a commercial debt.

(*Id.*, Ex. 42).

The next day, Stephen Day at Logistics Group sent the following e-mail to Dunlap Trucking:

> Ropner / Lloyds has decided to settle the claim on the CNC Machine
> and in order for them to do that our freight charges and insurance
> premiums must be paid in full.  Craig Reed [at MPCI] has sent a
> spread sheet outlining payments made to Dunlap Trucking Services
> Inc. totaling $243,577.04.  A portion of these payments should have
> been paid to Logistics Group International Inc. to pay our unpaid
> fr[e]ight invoices totaling $90,182 but were not.  So my question is,
> when are you going to pay us the balance so we can settle the claim?
> Please advise as soon as possible.

(*Id.*, Ex. 46).  On April 13, Day learned of Dunlap Trucking's financial situation.  Day e-mailed

Hussey at Avalon Risk, emphasizing the importance of obtaining all the insurance proceeds from

Amlin:

> I just hung up the phone with Craig Reed with Marubeni.  My
> suspicions about Dunlap Trucking have come true.  Craig just said
> that Dunlap has gone out of business and that Marubeni paid Dunlap
> all but $29k worth of freight charges.  Those freight charges should
> have been sent to LGI but Myron at Dunlap instead kept them for his
> self.  Now Craig at Marubeni wants me to pay him in full for the
> machine settlement and then figure out how to collect my unpaid
> freight charges from Dunlap because basically it's not his problem.
> Myron at Dunlap never paid me for any of the freight we are owed
> totaling $90,182.92.  With this being said, it is absolutely critical we
> are sent the settlement for the machine or we will never see any of the
> unpaid freight we are owed.  If they are paid the settlement they will
> never settle the unpaid freight with LGI.  Please keep this in mind.

(*Id.*, Ex. 48).

Three days earlier, on April 10, Dunlap Trucking sent a letter to MPCI releasing its

8

obligation to pay Dunlap Trucking for shipping the Machine and "request[ing] that the amount be paid directly to Logistics." (*Id.*, Ex. 50).  Reed, the Indianapolis branch manager of MPCI, sent a check for $29,417.68 to the Logistics Group president, Day, on April 20.  In the letter accompanying the check, Reed stated:

> This amount satisfies in full [MPCI's] contractual obligations to Dunlap relating to the shipments to Irapuato Mexico.  Now we are advised by Dunlap and have been provided copies of Insurance Certificates showing that LGI was subcontracted by Dunlap to provide insurance for [MPCI's] benefit against damage to the machinery and equipment being transported during the transporting of the equipment to Ryobi Die Casting in Mexico in Irapuato, Mexico.
>
> To date we have been advised that the insurer Ropner/Lloyds has confirmed their agreement and remitted payment to LGI for a claim, Claim Number: MC 007700 in the amount of USD 12,649.42 for the benefit of MPCI.  Further, we have been advised that Ropner/Lloyds has agreed to settle another claim, Claim Number MCC0068 in the amount of USD 312,015.00 for the benefit of MPCI and will remit said amount less USD 2,500.00 deductible to LGI upon LGI's signing of a subrogation agreement agreeing to this amount.
>
> Now MPCI expects LGI to remit payment to us without prejudice against these claims.  Our expectation is for payment to MPCI within five (5) working days from your receipt of this letter for the USD 12,649.42 and for the USD 312,015.00 upon receipt from the insurer.  If this remittance request is not met, LGI will be held accountable for any interest expenses incurred relating to claims settlement as a result of your delay.

(*Id.*, Ex. 49).  The same day, Day (at Logistics Group) e-mailed Reed (at MPCI), stating:

> If Myron at Dunlap authorized you to send me a payment towards his past due balance I'll agree to it.  You can send the check to the address below.  However, I will not deposit the check until the remaining amount of our past due freight invoices which include the insurance premiums have been received in full.

(*Id.*, Ex. 51).

9

By June 4, Amlin concluded that an interpleader action might be necessary:

> As you know, Underwriters wish to settle this claim as a matter of urgency.  However, a dispute has arisen between Marubeni and LGI regarding the proper payment of the policy proceeds.  Whilst it would appear that Marubeni, as the party that suffered the loss, would have the superior claim, Underwriters cannot act as referee and do not wish to be put in a position of having a second claim against them for the policy proceeds.
>
> In the circumstances, if Marubeni and LGI cannot resolve the matter between themselves, Underwriters will be obliged to file an interpleader action and pay the funds into court.  As this will involve expense for all concerned, Underwriters would prefer to avoid this course of action if possible.  However, if this dispute cannot be resolved by negotiation, Underwriters will commence an interpleader action next week.

(*Id.*, Ex. 41).  Amlin filed the interpleader action on August 21, 2009, naming MPCI and Logistics as the defendants.  (Docket Entry No. 1).  Amlin deposited $309,515 into the court's registry on September 18, 2009.  (Docket Entry No. 16).

On January 7, 2010, Ryobi assigned to MPCI "all claims Ryobi may possess against any person or entity" relating to the damaged Machine.  (Docket Entry No. 53, Ex. 52).  Logistics Group agreed to pay the replacement cost of the Machine, estimated at $279,000, and the "costs in outsourcing production due to the unavailability of the Machine," estimated at $43,000.  Logistics Group agreed that it remained responsible for shipping a replacement machine.  (*Id.*).  MPCI filed a cross-claim against Logistics Group the next day, January 8, asserting claims on Ryobi's behalf for breach of contract and negligent bailment.  (Docket Entry No. 28).

Dunlap Trucking also assigned MPCI "all claims [it] may possess against [Logistics Group] that in any way relate to the Machine" on February 1, 2010.  MPCI filed a second cross-claim in February 4, asserting a claim for breach of the contract between Dunlap Trucking and Logistics

10

Group.[6]  (Docket Entry No. 35).  This court dismissed Amlin on May 26 and awarded $16,216.69 in fees from the funds deposited with the court.  (Docket Entry No. 54).

MPCI and Logistics Group have filed cross-motions for summary judgment.  MPCI argues that is entitled to the insurance proceeds as Ryobi's assignee because the Machine was Ryobi's property.  MPCI also contends that it is owed attorneys' fees and consequential damages incurred when Ryobi had to outsource die casting at the Irapuato plant.  Logistics Group argues that it, not MPCI, is entitled to the insurance proceeds and that MPCI cannot assert any claims for breach of the contract between Logistics Group and Dunlap Trucking.[7]  Each motion and argument is analyzed below.

## II.    Analysis

### A.    The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).  If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325.  While the party moving for summary judgment must demonstrate the

---

[6]   MPCI initially asserted a claim under the Carmack Amendment, 42 U.S.C. § 14706, *et seq.*, but withdrew the claim in its amended crossclaim.  (Docket Entry No. 62).

[7]   Logistics Group moved to dismiss Carmack Amendment claim.  As noted, that claim was withdrawn.

absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(a) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

## B.    Entitlement to the Insurance Proceeds

MPCI provides three different grounds for entitlement to the insurance proceeds. MPCI claims that it is Ryobi's assignee and Ryobi, the Machine's owner, is entitled to the proceeds as either an insured with an insurable interest or as a third-party beneficiary of the Logistics Group Policy. MPCI also argues that Logistics Group was required to pay Dunlap Trucking under the May 29, 2008 contract between Dunlap Trucking and Logistics Group that included the requirement that

Logistics Group obtain insurance for the Machine during shipment.  MPCI argues that Logistics Group breached its contract with Dunlap Trucking by refusing to pay the insurance proceeds. Logistics Group claims that it should receive the insurance proceeds as an assignee of Dunlap Trucking's and Ryobi's claims under the contract with Logistics Group and the insurance policy.

The undisputed evidence in the summary judgment record shows that as a matter of law, MPCI is entitled to the insurance proceeds, not Logistics Group.  The record shows that Ryobi has an insurable interest and is an insured under the Logistics Group Policy, or is a third-party beneficiary of the Policy.  The record also shows that Logistics Group breached its contract with Dunlap Trucking by refusing to pay the insurance proceeds.

The first issue is whether MPCI has the right to pursue recovery on behalf Ryobi and Dunlap Trucking as the assignee of their claims.  An assignment is a "transfer of some right or interest." *Pagosa Oil & Gas, L.L.C. v. Marrs & Smith P'ship*, 323 S.W.3d 203, 211 (Tex. App.—El Paso 2010, reh'g denied) (citing *Univ. of Tex. Med. Branch at Galveston v. Allan*, 777 S.W.2d 450, 452 (Tex. App.—Houston [14th Dist.] 1989, no writ)).  The recipient of a valid assignment "steps into the shoes of the assignor and is considered under the law to have suffered the same injury as the assignors and have the same ability to pursue the claims." *Shipley v. Unifund CCR Partners*, — S.W.3d —, 2010 WL 4013378, at *2 (Tex. App.—Waco 2010, no pet.) (citing *Sw. Bell Tel. Co. v. Mktg. on Hold Inc.*, 308 S.W.3d 909, 916 (Tex. 2010)); *Pagosa Oil & Gas*, 323 S.W.3d at 211.  The parties to a contract may agree to make rights and duties unassignable. *Pagosa Oil & Gas*, 323 S.W.3d at 211.  Courts enforce antiassignment provisions unless a statute requires otherwise. *Id.*

MPCI asserts insurance claims on Ryobi's behalf.  MPCI has identified no contractual

provision that prevents such an assignment.  MPCI may assert a claim for the insurance proceeds as Ryobi's assignee.

MPCI also asserts a claim for breach of the May 29 shipping contract between Dunlap Trucking and Logistics Group, as an assignee of Dunlap Trucking's rights under that contract. Logistics Group contends that the antiassignment provision in its April 29, 2008 Transportation Co-Brokerage Agreement with Dunlap Trucking forbids this assignment.  (Docket Entry No. 54, Ex. 1-A).  The Agreement states that "[i]t may not be assigned or transferred in whole or in part."  (*Id.*, ¶ 9).  As MPCI points out, however, this Agreement applies only to situations in which Dunlap Trucking arranges for transports for Logistics Group.  In the present case, by contrast, Dunlap Trucking contracted with Logistics Group for it to arrange the transport.  The Co-Brokerage Agreement refers to Logistics Group as "**BROKER**" and MPCI as "**CO-BROKER**."  The recitals contemplate situations "in which, at **BROKER's** request, **CO-BROKER** as a broker for arranges for motor freight transportation for freight for which **BROKER** has been requested to arrange for transportation."  (*Id.*).  The Agreement provides for "**BROKER** to pay **CO-BROKER**" for these services.  (*Id.*, ¶ 4).  The conformation of the May 29 contract between Dunlap Trucking and Logistics Group does not refer to the Co-Brokerage Agreement between Logistics Group and Dunlap Trucking.  The Co-Brokerage Agreement's antiassignment clause does not apply.

Logistics Group contends that the assignments are void for lack of consideration. "Consideration is a bargained for exchange of promises" and "consists of benefits and detriments to the contracting parties." *See Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 409 (Tex. 1997), *superseded on other grounds by* TEX. GOV'T CODE §§ 2260.001–008. MPCI agreed not to sue Dunlap Trucking in exchange for the assignment of its rights. *Bank One, Texas, N.A. v. Tyler*, 970

F.2d 16, 25–26 & n.10 (5th Cir. 1992); *S.A. Dome v. Maloney Dev. P'ship.*, No. 04-04-00586-CV, 2005 WL 1398106, at *3 (Tex. App.—San Antonio 2005, no pet.).  MPCI agreed to replace the Machine and pay the costs of outsourcing the die casting to obtain Ryobi's right to sue.  The assignments are clearly supported by consideration.  MPCI may claim the proceeds either as an assignee of Ryobi's interest under the Policy or of Dunlap Trucking's claim for breach of contract.

Logistics Group argues that Ryobi lacked an insurable interest in the Machine.  An insurable interest is necessary to recover under a policy.  *See Valdez v. Colonial  Cnty. Mut. Ins. Co.*, 994 S.W.2d 910, 914–16 (Tex. App.—Austin 1999, pet denied).  An insurable interest exists "when the insured derives pecuniary benefit or advantage by the preservation and continued existence of the property or would sustain pecuniary loss from its destruction."  *Id.*  A property owner has an insurable interest in that property, but it is not necessary to own property to have an insurable interest in it.  *Id.*

Although Logistics Group disputes that Ryobi had an insurable interest in the Machine, Logistics Group has neither identified nor submitted summary judgment evidence that Ryobi did not own the Machine.  Logistics Group's Rule 30(b)(6) representative testified that he did not know who owned the Machine.  (Docket Entry No. 53, Ex. 20 at 79 ("I don't know who owned the machine at that time.")).  Mark C. Gunner, RDCM's general manager, testified in his affidavit that "Ryobi purchased [the Machine] from KGK International Corp."  (*Id.*, Ex. 1, ¶ 4).  The record presents no evidence supporting Logistics Group's position that Ryobi did not own the Machine.  The record does present uncontroverted evidence that Ryobi did own the Machine, giving it an insurable interest.

Logistics Group, by contrast, has no insurable interest in the Machine except insofar as it had

a contractual duty to procure insurance.  The only loss to Logistics Group from the Machine's destruction is exposure to liability not as a result of the destruction alone, but as a result of failing to provide insurance against the destruction.  Logistics Group appears to acknowledge this in arguing that it has an interest because it "is exposed to claims in connection with the cargo." (Docket Entry No. 54 at 8).

Logistics Group also claims that Ryobi may not assert a claim to the insurance proceeds because it is not an "insured."  But the Policy's definition of the "insureds" covers Ryobi: "Logistics Group International Inc. . . . and/or associate and/or subsidiary companies and/or for whom they have instructions to insure."  (Docket Entry No. 59, Ex. 2).  As Day conceded, Logistics Group's contract with Dunlap Trucking required Logistics Group to procure insurance covering the Machine. (Docket Entry No. 53, Ex. 20 at 29–30).

Logistics Group relies on the language of the certificate, which provides that "losses, if any, shall be payable to the order of LOGISTICS GROUP INTERNATIONAL INC. and/or Associate and/or Subsidiary Companies on surrender of this Certificate."  (Docket Entry No. 59, Ex. 1).  But the certificate does not purport to limit the Policy definition of an "insured."

Logistics Group attempts to characterize the Policy as providing something other than all-risk coverage against property damage or loss.  This characterization is squarely contradicted by the evidence in the record, including the e-mail communications Logistics Group with its broker and the position taken by its corporate representative during his deposition.  (Docket Entry No. 53, Ex. 19; Ex. 20 at 29–30; Ex. 57).  And this assertion is contrary to the Policy language.  The Policy covers "[n]ew general merchandise," subject to various exclusions for types of property not at issue here.  (Docket Entry No. 30, Ex. 15).  The certificate of insurance specifically lists the Machine.

16

(*Id.*, Ex. 16). "A contract provides property insurance if it binds the insurer to indemnify the insured for loss of identifiable property described either specifically or by general language, such as property in a certain place or within the possession of the insured." *Cumis Ins. Soc'y*, 480 S.W.2d at 765. Ryobi is alternatively a third-party beneficiary.

Additionally, Ryobi may assert a third-party claim.  Texas courts have long recognized that property owners may make third-party claims on an insurance policy that covers their property, unless the policy terms forbid third-party claims.  *See Lynch Props., Inc. v. Potomac Ins. Co. of Ill.*, 140 F.3d 622, 626–27 (5th Cir. 1998); *Conoco, Inc. v. Republic Ins. Co.*, 819 F.2d 120, 123–24 (5th Cir. 1987) (denying third-party claim on a policy that expressly excluded such a claim); *Cumis Ins. Soc'y v. Republic Nat'l Bank of Dallas*, 480 S.W. 762, 767 (Tex. App.—Dallas 1972, writ ref'd n.r.e.) ("[T]he owner of identifiable property which has been insured for its full value by a[n] . . . agent may, recover in a direct action against the insurer, though the contract contains no language expressly stating that the loss is payable to the owner or that the contract is made for his benefit.").

Logistics Group argues that it did not intend to provide insurance for Ryobi's benefit.  The record conclusively establishes the opposite.  The contract between Dunlap Trucking and Logistics Group required Logistics Group to secure insurance to cover Ryobi's Machine.  The Logistics Group worksheet lists "MEXICAN INSURANCE."  (Docket Entry No. 53, Ex. 14).  Logistics Group invoiced Dunlap Trucking $2,340.11 for insurance for the Machine during shipment. (Docket Entry No. 53, Ex. 14).  MPCI's attorney specifically asked the Rule 30(b)(6) corporate representative for Logistics Group, Bryan Keith Winkles, about the purpose of the insurance:

> Q.      . . . Logistics' contract with Dunlap required it to procure shippers coverage for the cargo owner's benefit, right?
>
> A.      Yes, on this machine, yes.

> Q.     Correct.  And it's still your testimony that the insurance that Logistics procured for this machine was for benefit of the cargo owner; it was not liability insurance, correct?
>
> A.     Yes, sir.

(Docket Entry No. 53, Ex. 20 at 29–30).

Logistics Group relies on two affidavits.  One, by Day, conclusorily states: "DUNLAP's contract with Logistics Group International, Inc. . . . did not require Logistics to procure shipper's interest insurance to make Ryobi whole at all."  (Docket Entry No. 54, Ex. 1 at 6).  The other, by Winkles, states that the Dunlap Trucking Agreement with Logistics Group did not require it to "procure shipper's interest insurance for RYOBI Die Casting USA, Inc's benefit or RDCM's benefit or to make RYOBI or RDCM whole in the event the [Machine] was damaged during any transportation." (*Id*., Ex. 2 at 2).  These affidavits are squarely contradicted by the deposition testimony of Winkles, the designated corporate representative for Logistics Group.  A nonmovant cannot "defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony." *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996) (describing the rule as "well settled") (citing *Thurman v. Sears, Roebuck & Co.*, 952 F.2d 128, 137 n.23 (5th Cir. 1992)).  When a party's affidavit contradicts earlier deposition testimony, "such a contradictory sworn statement should not be considered when no explanation is offered for the inconsistency." *BLS Joint Venture v. Bank Home Savings Ass'n*, 985 F.2d 556, at *4 (5th Cir. 1993) (per curiam) (unpublished) (citation omitted).  Logistics Group has not explained the contradiction between the affidavits and its corporate representative's earlier deposition testimony.  Nor has Logistics Group presented any evidence or argument to support the assertion in the affidavits that Logistics Group was neither required to provide, nor provided, insurance for the shipment of the

18

Machine.

MPCI is also entitled to recover the proceeds as the assignee of Dunlap Trucking's breach of contract claim against Logistics Group.  Under Texas law, "'[t]he essential elements of a breach of contract action are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach.'"  *Am. Gen. Life Ins. Co. v. Kirsh*, 378 F. App'x 379, 383 (5th Cir. May 11, 2010) (citing *Smith Int'l, Inc. v. Eagle Grp. LLC*, 490 F.3d 380, 387 (5th Cir. 2007)). Dunlap Trucking entered into a contract with Logistics Group under which it was required to procure shipper's coverage for the cargo owner's benefit.  Logistics Group charged Dunlap Trucking $2,340.11 for "MEXICAN INSURANCE."  (Docket Entry No. 53, Ex. 11).  By refusing to pay Dunlap Trucking, MPCI, or Ryobi for the Machine, and by interfering with their ability to recover the Policy proceeds when the Machine was destroyed, Logistics Group breached the Dunlap Trucking contract.

Logistics Group also argues that MPCI cannot recover because Dunlap Trucking did not timely notify it of the damage to the Machine.  Logistics Group relies on the "30 Day Credit Terms & Conditions" Agreement between Logistics Group and Dunlap Trucking.  (Docket Entry No. 54, Ex. 1-B).  The Agreement was signed on April 29, 2008.  (*Id.*).  Under the Agreement, it is "a condition precedent to any recovery by [Dunlap Trucking that it] provide to [Logistics Group] written notice of any claims for loss, damage, injury, or delay arising from or relating to any Services provided by [Logistics Group] within 9 months after the delivery of said goods."  (*Id.*). MPCI contends that this Agreement does not apply but also argues that even if it does, Dunlap Trucking made a timely claim.

19

The Machine was delivered to RDCM on June 11, 2008.  The record indicates that at least as early as July 29, 2008, Dunlap Trucking had notified Logistics Group of the claim.  In an e-mail dated July 29, Winkles, the Logistics Group salesperson, informed Myron Dunlap that "[w]e will provide supporting documents upon [the insurer's request] but claim has to [be] done by you."  (*Id.*, Ex. 26).  Winkles pledged that "we will help as much as we can."  (*Id.*).  This e-mail clearly shows that Dunlap Trucking had notified Logistics Group of the loss before July 29.  Texas courts do not strictly enforce the requirement of a written proof of loss in the insurance context when the insured communicates the substance of the claim to the insurer.  *See, e.g.*, *Henry v. Aetna Cas. & Sur. Co.*, 633 S.W.2d 583, 584–85 (Tex. App.—Texarkana 1982, writ ref'd n.r.e.).  The conclusory affidavits Logistics Group submitted on the issue do not create a disputed fact issue.  *See, e.g.*, *Batton v. Evers*, 598 F.3d 169, 179 (5th Cir. 2010).  As a matter of law, Dunlap Trucking provided timely notice of the loss and claim to Logistics Group.

Dunlap Trucking owed Logistics Group $6,390.11 for services related to the Machine under the contract.  Dunlap Trucking also owed Logistics Group amounts unrelated to that contract.  MPCI paid Logistics Group $29,417.68— $23,027.57 more than Dunlap Trucking owed on the contract for transporting and insuring the Machine.  Logistics Group admits that the check it received from MPCI on Dunlap Trucking's behalf more than covered the amount Dunlap Trucking owed under the contract relating to the Machine.  (Docket Entry No. 53, Ex. 20 at 78–79).  Although Logistics Group protests that it has not cashed the check MPCI sent on Dunlap Trucking's behalf, tendering payment fulfilled Dunlap Trucking's payment obligation on the contract at issue.  *Am. Gen. Life Ins. Co.*, 378 F. App'x at 383.  The existence of other unrelated unpaid debts to Logistics Group by Dunlap Trucking does not allow Logistics Group to withhold the insurance proceeds from Ryobi

20

on a covered loss, to breach the contract with Dunlap Trucking, or to refuse to pay MPCI as their assignee.

As a matter of law, MPCI is entitled to recover the insurance proceeds; Logistics Group is not.

### B.      Attroneys' Fees

"State law controls both the award of and the reasonableness of fees awarded where state law supplies the rule of decision." *Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002). MPCI "may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs" for a breach of contract. TEX. CIV. PRAC. & REM. CODE § 38.001(8). A court must award reasonable attorneys' fees and costs if there is proof of the reasonableness of the request and the plaintiff has been awarded damages. *Mathis*, 302 F.3d at 462 (citing TEX. CIV. PRAC. & REM. CODE § 38.001(8)). MPCI bears the burden of proving reasonableness of the fees and of providing sufficient documentation to support an award. *Pelt v. U.S. Bank Trust Nat'l Ass'n*, 259 F. Supp. 2d 541, 543 (N.D. Tex. 2003). A court calculates the appropriate fee award in light of a "a rebuttable presumption of reasonableness for fees that are 'usual' or 'customary'" and the ability of the court to "take judicial notice of the 'usual and customary fees' and the contents of the case file." *Id.* (citing TEX. CIV. PRAC. & REM. CODE §§ 38.003, 38.004).

Texas courts use the lodestar method for calculating attorneys' fees. *Toshiba Mach. Co., Am. v. SPM Flow Control, Inc.*, 180 S.W.3d 761, 782 (Tex. App.—Fort Worth 2005, pet. granted, judgm't vacated w.r.m.); *see also Guity v. C.C.I. Enter.*, 54 S.W.3d 526, 528 (Tex. App.—Houston [1st Dist.] 2001, no pet.) ("In determining the reasonableness of attorney's fees, the fact finder must be guided by a specific standard. This standard is substantially similar under both federal law and

state law.").  The first step is to determine the reasonable hourly rate for the attorneys and nonlegal

personnel who worked on the case.  The reasonable hourly rate is based on "the prevailing market

rates in the relevant community."  *Blum v. Stenson*, 465 U.S. 886, 895 (1984).  The second step is

to determine the number of hours "reasonably expended" by the attorneys.  *McClain v. Lufkin

Indus., Inc.*, 519 F.3d 264, 284 (5th Cir. 2008).  The court then multiplies the hours "reasonably

expended" by the reasonable hourly rate to determine the lodestar figure.  *Id.*  The fee applicant has

the burden of demonstrating the reasonableness of the hours expended and the hourly rates charged.

*Id.*

Once the lodestar is determined, a court must determine whether to increase or decrease the

amount based on the factors set out in *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir.

1974), *overruled on other grounds by Blanchard v. Bergeron*, 489 U.S. 87 (1989).  The twelve

*Johnson* factors are (1) the time and labor involved, (2) the novelty and difficulty of the questions,

(3) the skill requisite to perform the legal services properly, (4) the preclusion of other employment

due to this case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time

limitations, (8) the amount involved and results obtained, (9) the experience, reputation, and ability

of counsel, (10) the undesirability of the case, (11) the nature and length of the professional

relationship with the client, and (12) awards in similar cases.  *Id.* at 717–19.  Texas courts weigh the

similar factors set out in Rule 1.04 of the Texas Disciplinary Rules of Professional Conduct to

determine reasonable fees.  *See Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818

(Tex. 1997); *Brazos Elec. Power Co-op., Inc. v. Weber*, 238 S.W.3d 582, 585–87 (Tex.

App.—Dallas 2007, no pet.).

MPCI seeks $90,103.45 in attorneys' fees and costs.  The amount represents 312.9 hours of

22

attorney time at just under $250 per hour; 41.4 hours of paralegal time at approximately $165 per hour; and $6,032.45 in costs.  (Docket Entry No. 58, Ex. 4).  The affidavit asserts that MPCI incurred approximately $2,000 more in fees for which it is not seeking payment.  The attorney whose work accounts for nearly all the hours billed asserts that he "reviewed every filing and document served in discovery"; participated in numerous conferences with MPCI representatives and with other counsel for the parties involved"; "drafted every pleading and brief filed by MPCI"; and "participated in every deposition taken in this case."  (Docket Entry No. 53, Ex. 24).  Logistics Group has not challenged the number of hours or the rates MPCI seeks to recover as unreasonable. Logistics does not object to the fees and costs sought.

"[I]n the context of a fee award to be paid by a litigation opponent, the court generally is not obliged to scrutinize the fee motion in the absence of formal opposition to the fee request. Accordingly, if the party against whom fees will be assessed does not oppose the fee motion . . . , the court may treat the failure to oppose the motion as a concession of the right to a fee or its amount."  2 MARY FRANCIS DERFNER & ARTHUR D. WOLF, COURT AWARDED ATTORNEY FEES ¶ 18.03[3][a], at 18-54 (2010) (citing cases); *see also Rhoads v. Casey*, 196 F.3d 592, 603 (5th Cir. 1999) (affirming fee award when appellant did not object and appellee provided an affidavit to the district court setting forth the amount of fees); *United States ex rel. Wallace v. Flintco, Inc.*, 143 F.3d 955, 971 (5th Cir. 1998) (affirming fee award when the law provided for fees and the appellant did not object) (citing *Powell v. Old S. Life Ins. Co.*, 780 F.2d 1265, 1268 (5th Cir. 1986).

This court concludes that the number of hours and the hourly rates charged, along with the costs incurred, are reasonable for this case.  Logistics Group raised numerous arguments against MPCI's right to recover the insurance proceeds, to which MPCI was required to respond.  Logistics

Group also filed not just one, but two, motions for summary judgment. Logistics Group used the insurance proceeds it owed Ryobi for the loss of the Machine as a source to avoid losing money when Dunlap Trucking encountered financial difficulties and was unable to pay all its debts, even though the unpaid debts were unrelated to shipping the Machine. The motion for summary judgment as to attroneys' fees and costs is granted.

### C.    Consequential Damages

MPCI moves for summary judgment that it is entitled to consequential damages. Consequential damages "result naturally, but not necessarily, from the defendant's wrongful acts." *Stuart v. Bayless*, 964 S.W.2d 920, 922 (Tex. 1998) (quoting *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex. 1997)). "They are not recoverable unless the parties contemplated at the time they made the contract that such damages would be a probable result of the breach." *Id.* (citing *Mead v. Johnson Group, Inc.*, 615 S.W.2d 685, 687 (Tex. 1981)). MPCI contends that it is entitled to consequential damages based on losses Ryobi suffered when it was unable to use the Machine or replace it because Logistics Group interfered with its ability to obtain the insurance proceeds. But MPCI has not presented evidence establishing, as a matter of law, that Logistics Group knew about Ryobi's intended use of the Machine or that the losses otherwise were foreseeable. MPCI has not shown its entitlement to consequential damages.

## IV.    Conclusion

MPCI's motion for summary judgment is granted. Logistics Group's motions for summary judgment are denied. MPCI is entitled to recover attorneys' fees and costs of court from Logistics Group in the amount of $90,103.45, plus postjudgment interest.

Final judgment is entered by separate order.

SIGNED on March 17, 2011, at Houston, Texas.

Lee H. Rosenthal
United States District Judge